**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT J. ABRAHAM, | ) |
| | ) 2:18-cv-01192-RJC |
| Plaintiff, | ) |
| | ) |
| vs. | ) Judge Robert J. Colville |
| | ) |
| MEGAN BRENNAN, AS POSTMASTER | ) |
| GENERAL AND CEO OF THE UNITED | ) |
| STATES POSTAL SERVICE, | ) |
| | ) |
| Defendant. | ) |

## OPINION

Robert J. Colville, United States District Judge

Before the Court is the Motion for Summary Judgment (ECF No. 60) filed by Defendant Megan J. Brennan, as Postmaster General and CEO of the United States Postal Service ("Defendant"). Defendant asserts that summary judgment in Defendant's favor is appropriate with respect to each of the four claims set forth in the operative Second Amended Complaint (the "Complaint") (ECF No. 35) filed by Plaintiff Robert J. Abraham ("Plaintiff"). Br. in Supp. 2, ECF No. 61. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Defendant's Motion has been fully briefed and is ripe for disposition.

### I.   Factual Background & Procedural History

Plaintiff seeks injunctive and declaratory relief and damages for alleged violations of the Rehabilitation Act of 1973 ("Rehabilitation Act") and the Age Discrimination in Employment Act ("ADEA"). Compl. ¶ 1, ECF No. 35. Plaintiff asserts that he is an individual with mental disabilities, including Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression, Compl. ¶ 6, ECF No. 35, and sets forth claims for Defendant's alleged discrimination based on a failure to

1

provide reasonable accommodations for Plaintiff's disabilities (Count I) and retaliation (Count II) in violation of the Rehabilitation Act.  Plaintiff also asserts that he is over the age of forty (40), *id.* at ¶ 42, and further sets forth claims for discrimination (Count III) and retaliation (Count IV) under the ADEA against Defendants.  Unless otherwise noted, the following facts are not in dispute:[1]

### A.  Plaintiff's Employment

Plaintiff is a 58-year-old employee of the United States Postal Service's Office of the Inspector General (the "OIG").  Combined Statement 1 ¶ 1, ECF No. 86.  Plaintiff began working for the OIG, and specifically the OIG's Office of Audit, in November 2002 as an audit evaluator analyst, a position that is essentially identical to his current position.  *Id.* at 1 ¶ 2.  As an audit evaluator analyst during the timeframe relevant herein, Plaintiff worked on audits, but also spent approximately one-third of his time working on Decision Analysis Reports ("DARs"), which involve determining whether the Postal Service's decision to make a purchase is reasonable.  *Id.* at 6 ¶¶ 15-16.  Audit evaluator analysts such as Plaintiff are sometimes expected to work with employees from other OIG offices, and are sometimes required to communicate and collaborate telephonically, as well as through email, instant messaging, and videoconference.  *Id.* at 2-3 ¶ 7.  All OIG employees are required to behave in a courteous and professional manner.  *Id.* at 3-4 ¶ 9.

The OIG's Office of Audit has offices and employees in Rosslyn, VA, St. Louis, MO, Boston, MA, Bethesda, MD, and Warrendale, PA (the "Pittsburgh Office").  Combined Statement 1 ¶ 3, ECF No. 86.  While employed with the OIG, Plaintiff has been stationed exclusively out of the Pittsburgh Office, which has generally had between nine and thirteen total employees stationed in that Office during the timeframe relevant herein.  *Id.* at 2 ¶ 4.  The OIG's Office of Audit is

---

[1] The parties have submitted a Combined Concise Statement of Material Facts (ECF No. 86), which the Court shall cite to as "Combined Statement."  Because both Defendant's and Plaintiff's Concise Statements begin at ¶ 1 in the Combined Statement, the Court shall cite to both a page and paragraph number in citing to the Combined Statement.

divided into program areas, which are further divided into "directorates," each of which is devoted to a particular subject area and may be comprised of employees stationed out of different OIG offices. *Id.* at 2 ¶ 5. Program areas are managed by Deputy Assistant Inspector Generals. *Id.* at 48 ¶ 15. Directors manage directorates, and report to Deputy Assistant Inspector Generals. *Id.* at 48 ¶ 16. Directors further manage: (1) a Deputy Director; (2) Operational Managers, who are responsible for overseeing one or more audits and who appoint and manage a lead auditor, referred to as an auditor-in-charge, for each audit; and (3) Human Capital Managers, who are largely responsible for human resources tasks and for drafting annual performance reviews. *Id.* at 49 ¶ 17-18. Human Capital Managers provide annual performance reviews for approximately twenty-to-thirty individual auditors. *Id.* at 49 ¶ 21. The annual performance review process consists of a planning phase prior to the start of the fiscal year, a mid-year review or "coaching phase," and an end-of-year review. *Id.* at 49 ¶ 20. During a single fiscal year, an individual auditor may work for multiple Operational Managers. *Id.* As of September 2016, Plaintiff reported to:

> (a) First-line supervisor Janice Pegram-Lewis, a Human Capital Manager based in Rosslyn, Virginia;
>
> (b) Second-line supervisor Guy Sergi, the acting Deputy Director of Cost, Pricing and Investments [directorate], based in Boston, Massachusetts;
>
> (c) Third-line supervisor Charles Turley, the Director of Cost, Pricing and Investments [directorate], based in Rosslyn, Virginia; and
>
> (d) Fourth-line supervisor John Cihota, the Deputy Assistant Inspector General for Finance, Pricing, and Investments [program area], based in St. Louis, Missouri.

*Id.* at 4 ¶ 12.[2]

---

[2] Plaintiff disputes these assertions to an extent in asserting that he also reported to additional supervisors during Fiscal Year 2016. Plaintiff avers that Julie Wong, an operational manager based in Rosslyn, Virginia, was also Plaintiff's first-line supervisor for a brief period in Fiscal Year 2016, and that he was managed by several other individuals in Fiscal Year 2016, specifically: "Mike Thompson (who managed Plaintiff throughout the [2016] fiscal year in his work on DAR reports), Tim Cole (who managed Plaintiff on multiple projects), Ernest Osekwe (an auditor-in-charge or AIC)[,] and Anthony Williams (an operations manager), among others." Combined Statement 4 ¶ 12, ECF No. 86.

### B. Plaintiff's Mental Health Conditions

Plaintiff has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), anxiety, major depression, and ADHD. Combined Statement 44 ¶¶ 1-3, ECF No. 86. Plaintiff sought treatment for his mental health conditions in 2011 and 2012. *Id.* at 44-46 ¶¶ 3; 7. When his panic and anxiety attacks began to affect his work on a particular project in 2012, Plaintiff reported the issue to his then-supervisor at the OIG, Joseph Wolski, who adjusted Plaintiff's workload such that Plaintiff was able to continue working without taking a medical leave of absence. *Id.* at 45-46 ¶ 7. In 2015, Plaintiff notified his then-supervisor, Tim Cole, that he had mental health conditions, and Plaintiff also testified that he separately notified Human Capital Manager Janice Pegram-Lewis in late 2015 about his conditions, which Plaintiff characterized as disabilities. *Id.* at 46 ¶ 8. In certain instances, Plaintiff struggled in his interactions with coworkers, and could become frustrated and passionate and increase the tone of his voice when speaking to coworkers.[3] *Id.* at 67-7, ¶¶ 17-19; 46-47 ¶ 9. During certain interactions, Mr. Cole would take breaks from conversations and meetings involving Plaintiff due to Plaintiff's behavior and reactions to certain situations. *Id.* at 7 ¶ 21; 46-47 ¶ 9.

### C. Letter of Warning and Failed Annual Performance Review

In Fiscal Year 2015, Plaintiff received a "Below Expectations" in his annual performance review in the category of "Leadership and Professionalism," with the following comments being provided in his 2015 "Employee Performance Evaluation Report":

> [Plaintiff] needs to demonstrate more confidence in his team leaders, operational manager, and director. He often challenges audit objectives and methodology and tends to put the positions of Postal Service management ahead of the team's priorities in developing potential issues. [Plaintiff] is a good auditor, but he needs

---

[3] Plaintiff avers that these reactions are caused by his mental health conditions, which he avers are triggered by environmental stimuli which cause Plaintiff to feel "threatened, attacked, panicked, unheard, and powerless to help himself or his situation." Combined Statement 44-45, ¶¶ 4-5; 46-47 ¶ 9, ECF No. 86. Defendant denies the same because, inter alia, "Plaintiff is not qualified to give such an expert opinion." *Id.*

to work on his patience, control his emotions, and demonstrate a healthy professional skepticism of Postal Service programs when conducting audits.

Appendix Ex. G at 3, ECF No. 63.  In 2016, Plaintiff participated in a mid-year "coaching phase" conference for Fiscal Year 2016 with Cost, Pricing, and Investments Directorate Director Charles Turley and Ms. Pegram Lewis, during which Mr. Turley expressed that he had no issues with Plaintiff's performance at that time.  Combined Statement 58 ¶ 42, ECF No. 86.  The mid-year/"coaching phase" review section of Plaintiff's Fiscal Year 2016 "Employee Performance Evaluation Report" (the "2016 Performance Review") indicates, under the category of "Leadership and Professionalism," the following: "[Plaintiff's] knowledge and experience causes him to be passionate about his work, however, he should discern when and what discussions will provide the best value. to management and his team members."  Appendix Ex. H at 3, ECF No. 63.

In August 2016, Plaintiff requested six weeks of leave from September 12, 2016 to October 20, 2016 pursuant to the Family and Medical Leave Act to care for his wife, who was scheduled to undergo surgery, and this request for FMLA leave was ultimately approved.    Combined Statement 59 ¶ 43, ECF No. 86.  In late August 2016, Plaintiff was assigned to work on an audit of the Postal Service's Mobile Delivery Device ("MDD") units.  *Id.* at 10 ¶ 26.  As part of that audit, Plaintiff participated in a teleconference call on September 1, 2016 with the four other members of the MDD audit team, each of whom was based in Rosslyn, Virginia, including Julie Wong, the Rosslyn, Virginia-based Operational Manager for the MDD audit.  *Id.* at 11 ¶ 26. During this teleconference, Plaintiff expressed strong disagreement with respect to the MDD audit team's intent to look at the MDD's return on investment.  *Id.* at 11 ¶ 27.  A "Record of Teleconference" cited to by Defendant provides that Plaintiff "became angry and disrespectful" during this teleconference, and that he made "aggressive and disrespectful comments" to other teleconference participants.  Appendix Ex. R, ECF No. 63.  Plaintiff denies that he became angry

5

or disrespectful and further denies that he made derogatory remarks.  Combined Statement 11 ¶
27, ECF No. 86.  The "Record of Teleconference" also provides that Plaintiff apologized to the
team during this teleconference, and that each team member accepted his apology.  Appendix Ex.
R, ECF No. 63; *see also* Appendix Ex. T, ECF No. 63.

On September 7, 2016, Plaintiff participated in another teleconference with the MDD audit
team, during which Plaintiff stated that he would contact Congress regarding the MDD audit to
report fraud and waste at the OIG.  Combined Statement 12-13 ¶¶ 29-30, ECF No. 86.  A document
similar to the "Record of Teleconference" discussed above provides that Plaintiff again made
"disrespectful and aggressive" comments during the September 7, 2016 teleconference.  Appendix
Ex. S, ECF No. 63.  Plaintiff denies that he was disrespectful or aggressive.  Combined Statement
13 ¶ 30, ECF No. 86.  After the September 7, 2016 teleconference, Plaintiff sent an email to Ms.
Wong wherein he stated that he would contact the Workplace Environment team within the Special
Inquiries Division of the OIG regarding concerns arising from his purportedly "tense, stressful,
and intimidating work environment," and further stated that he intended to pursue reasonable
accommodations with the Equal Employment Opportunity Commission ("EEO").  *Id.* at 62-63 ¶
47; *see also* Pl.'s Concise Statement Ex. 12, ECF No. 71. [4]

Each of the teleconferences discussed above involved technical difficulties on the part of
team members other than Plaintiff which ultimately resulted in videoconferencing technology not
being utilized for the meetings.  *Id.* at 60-62 ¶¶ 46-47.  With respect to the September 1, 2016 and
September 7, 2016 teleconferences, Defendant provides:

> Plaintiff acknowledged that, during the two calls, he: a) raised his voice (Ex. A,
> Abraham Dep. at 159:3-6, 161:8-12); b) said or did things that other participants
> may have taken personally (*id.* at 160:16-23); c) threatened to report OIG's "waste"
> to Congress (*id.* at 164:24-165:4); d) said he could no longer work on the MDD

---

[4] Most of Plaintiff's Exhibits are attached to ECF No. 71.  The Court shall cite to such Exhibits in the following
manner: "Pl.'s Concise Statement Ex. ___, ECF No. 71."

audit (*id.* at 165:5-15); e) got "passionate" (*id.* at 165:20-23); f) became "loud" and "more frustrated" (Ex. U, Apr. 19, 2017 Aff. of. R. Abraham in EEO 56-000-0003-17 at PLT000218-19); and g) "came across poorly over the phone." (Ex. O, Appeal of FY 2016 Performance Review at PLT00558.).

*Id.* at 15 ¶ 33.[5]  On a subsequent phone call with Ms. Pegram-Lewis on September 7, 2016, Plaintiff characterized the MDD audit as "wasteful," threatened to go to Congress and the New York Times to report the OIG's purported wasteful and fraudulent spending, and claimed that the OIG was violating "the yellow book."  *Id.* at 16-18 ¶¶ 36-37.

On September 12, 2016, Ms. Pegram-Lewis, after gathering facts and engaging in conversations with the Office of General Counsel's Employee Relations department regarding the September 1, 2016 and September 7, 2016 teleconferences, was authorized by Finance, Pricing, and Investments Deputy Assistant Inspector General John Cihota, Plaintiff's fourth-line supervisor, to make a decision regarding whether to take disciplinary action against Plaintiff. Combined Statement 18-20 ¶¶ 38-41, ECF No. 86.  On September 21, 2016, Ms. Pegram-Lewis emailed an official Letter of Warning dated September 15, 2016 (the "Letter of Warning") to Plaintiff as discipline for Plaintiff's purportedly unprofessional conduct.  *Id.* at 21 ¶ 45.  The Letter of Warning referenced the negative comments in the "Leadership and Professionalism" categories of his Fiscal Year 2015 "Employee Performance Evaluation Report" and his Fiscal Year 2016 mid-year "coaching phase" performance review.  Appendix Ex. F at 1, ECF No. 63.  The Letter of Warning further provides as follow with respect to the September 1, 2016 and September 7, 2016 teleconferences:

---

[5] The Court notes that Plaintiff generally admits this statement.  Combined Statement 15 ¶ 33, ECF No. 86.  He avers, however, that he did not definitively say that he could no longer work on the MDD audit; but, rather that he stated that he would do what was asked of him and that it may be better for him to not work on the project because he was going on FMLA leave for six weeks in the near future.  *Id.*; *see also* Appendix Ex. A at 165:17-19, ECF No. 63 ("I said I want to be [removed from the MDD audit team], I even said to her, I can't take myself off this team.  If you tell me I have to do the MDD audit, I will do it, you're the boss.").

During a teleconference on September 1, 2016, you acted unprofessionally and were aggressive and disrespectful in your comments to the team.  You stated no one understood audit the way you do because you have years of experience working on both sides (Postal Service and the OIG), and that you completed over 100 audits, while your team members may have completed a few audits.  You commented that the OIG was hypocritical and didn't add value to its customers with this audit.  You said that with any audit the OIG performed, the recommendations were meaningless.

Your manager made repeated requests for you to employ diplomacy, yet you continued to interrupt team members and the operations manager while they were speaking.  You also stated you did not care how the team perceived the way you delivered your comments.

On September 7, 2016, you again acted unprofessionally during a team teleconference.  You stated the audit was a waste of time, you would not work on the project, and would be taking FMLA leave for 2-4 weeks.  You stated the audit was irrelevant, you are removing yourself from the audit, and would express to Congress the waste of resources used during the audit by the OIG.

Later that day, you contacted me to discuss your discontent with your work location and assignments.  During our conversation you made additional unprofessional comments directed toward your peers, managers and the OIG.  You stated to me that you were tired of working meaningless and meritless audits with people who did not know what they were doing.  You told me your sister works for the New York Times, and you would have her report on the fraud and wasteful spending by the agency.  You also stated you would go to Congress as a whistleblower regarding wasteful spending by the OIG.

*Id.* at 1-2.

The Letter of Warning further provided: "[y]ou are entitled to your opinions about the work performed by the Office of Audit and the auditors with whom you work.  It is your right to report what you perceive as fraud waste or abuse to Congress or anyone else you deem appropriate." Appendix Ex. F at 2, ECF No. 63.  The Letter of Warning cited "The Employee and Labor Relations Manual (ELM), § 665.16" for the proposition that OIG employees must conduct themselves in a manner that reflects favorably upon the Postal Service, must be courteous, and "are expected to maintain harmonious working relationships and not to do anything that would contribute to an unpleasant working environment."  *Id.* at 2-3.  Ms. Pegram-Lewis concluded the

Letter of Warning by stating: "[y]our actions reflected negatively upon the image of the Office of Audit.  The comments you made were unprofessional, inappropriate, and violate agency policy with which you must comply."  *Id.* at 3.  The Letter of Warning provided instructions respecting ways in which Plaintiff could improve his conduct, and explained that future incidents could result in further discipline.  *Id.*  The Letter of Warning was eventually removed from Plaintiff's personnel file in September 2018, presumably on the basis of no further incidents.[6]  Combined Statement 23 ¶ 47, ECF No. 86.

In November 2016, Ms. Pegram-Lewis provided Plaintiff with a copy of the end of year "Review Phase" version of the 2016 Performance Review.  *Id.* at 23 ¶ 48.  In the "Review Phase" section, the 2016 Performance Review provided that Plaintiff's performance "Met Expectations" in three of the five provided-for elements (specifically, "Results," "Innovation," and "Knowledge"), that his performance was "Below Expectations" in the "Flexibility" element, and that his performance was "Unacceptable" in the "Leadership and Professionalism" element.  *Id.* at 23 ¶ 49; *see also* Appendix Ex. H, ECF No. 63.  With respect to "Leadership and Professionalism," the 2016 Performance Review provided:

> During FY 2016, [Plaintiff] demonstrated unacceptable leadership and professionalism.  [Plaintiff] did not demonstrate positive interpersonal skills and was unwilling to collaborate and promote teamwork.  Management had discussions with [Plaintiff] during the coaching phase.  During FY 2016, [Plaintiff] completed the training course: Strengthening People Skills In The Workplace.  However, when he was assigned to the Mobile Delivery Device audit project, he made inappropriate and unprofessional comments during team meetings.  Consequently, [Plaintiff] was reassigned to another project, and counseled for his lack of professionalism.  Management is committed to work with [Plaintiff] so that he can meet expectations for this element, and [Plaintiff] is encouraged to implement the documented strategies that [were] discussed with him, to help him achieve a satisfactorily rating for this element.

---

[6] *See* Appendix Ex. F at 3 ("This Letter of Warning will be entered in your official personnel folder for a period of two years unless otherwise resolved or cited in subsequent disciplinary action.").

Appendix Ex. H. at 3, ECF No. 63.  With respect to "Flexibility," the 2016 Performance Review provided:

> For FY 2016, [Plaintiff] did not meet expectations for flexibility[,] adaptability[,] and resilience.  The directorate experienced a reorganization which required [Plaintiff] to be the sole person in the directorate that was domiciled in Pittsburgh.  To promote teamwork and to prevent [Plaintiff] from being pigeon-holed into doing DAR work, management determined [Plaintiff] would work on the Mobile Delivery Device (MDD) audit.  [Plaintiff] demonstrated his inability to adapt to these changes and was removed from the MDD audit project.  Nevertheless, management is committed to working with [Plaintiff] so that he can demonstrate more resolve and a positive spirit when he is faced with assignment and organizational changes.

*Id.* at 4.  Plaintiff appealed the 2016 Performance Review, and that appeal was ultimately denied by Mr. Turley, who served as the appeal official.[7]  Combined Statement 27 ¶ 55, ECF No. 86. Because of the 2016 Performance Review, Plaintiff was not eligible for a performance-based salary raise of roughly one-to-two percent of his salary for Fiscal Year 2017.  *Id.* at 28 ¶ 57.  The Letter of Warning was the only letter of warning Plaintiff has received during his tenure at the OIG, and the 2016 Performance Review was his only failing review.  *Id.* at 63 ¶ 48.

### D.  Plaintiff's Requests for a Transfer

With respect to the OIG process for providing reasonable accommodations for OIG employees, Plaintiff avers:

> The Employee Relations department is a division of Office of General Counsel. The Employee Relations ("ER") department exists primarily to act as a resource for OIG managers; to consult for and advise managers in the areas of misconduct and poor performance.  The ER also works with Human Resources on medical issues, FMLA, and reasonable accommodations.  The Reasonable Accommodations Committee ("RAC") is a group which is formed from time to time, and usually consists of one member of the ER, one or two members of Human Resources, sometimes the managers of the respective employee seeking an accommodation, and possibly persons from the Mission Support office.

---

[7] Plaintiff asserts that it was inappropriate for Mr. Turley to serve as the appeal official.  Combined Statement 66 ¶ 54, ECF No. 86.

Combined Statement 52, ¶ 30, ECF No. 86.[8]  The OIG provides training to its managers with respect to the OIG's reasonable accommodation process regarding individuals who report difficulties at work purportedly caused by that individual's mental health conditions.  *Id.* at 52-53, ¶¶ 30-32.  Plaintiff testified that he did not receive such training.  *Id.* at 53 ¶ 32.

Over the past several years, the OIG's Office of Audit has undergone multiple reorganizations, which have involved, inter alia, changes to the titles, functions, and makeup of the OIG Office of Audit's program areas, directorates, and reporting hierarchies.  *Id.* at 2 ¶ 6.  In Fiscal Year 2015, Plaintiff was transferred to the Major Investments directorate, which had at least one other member based in the Pittsburgh Office.  *Id.* at 4 ¶ 10.  In April 2016, Plaintiff was reassigned to the new Cost, Pricing, and Investments directorate, which was managed by Director Charles Turley, as part of an OIG-wide reorganization.  *Id.* at 4 ¶ 11; 54 ¶ 34.  At roughly the same time as Plaintiff's reassignment to the Cost, Pricing, and Investments directorate, the only other Pittsburgh Office-stationed member of that directorate retired.  *Id.* at 54-55 ¶ 35.  All other members of this directorate were stationed at other OIG offices.  *Id.* at 55 ¶ 36.

Following his transfer to the Cost, Pricing, and Investments directorate, Plaintiff, citing his lack of background in cost and pricing, the retirement of his colleague in Pittsburgh, and the resulting lack of coworkers in Pittsburgh to collaborate with, requested an intra-office transfer to another directorate in Pittsburgh from Mr. Turley.  *Id.* at 55-56 ¶ 37.  Plaintiff did not cite any mental illness or other health-related issue in initially requesting this transfer.  *Id.* at 31 ¶ 63.  Mr. Turley initially supported Plaintiff's transfer request, but Mr. Cihota, Mr. Turley's supervisor, tabled the request, citing reasons unrelated to Plaintiff's disability status, age, or any past protected activity.  *Id.* at 32 ¶ 64.  This transfer request was ultimately denied by either Mr. Turley or Mr.

---

[8] The Court notes that Defendant denies that these averments are material to Defendant's Motion for Summary Judgment.  Combined Statement 52, ¶ 30, ECF No. 86

Cihota.  *Id.* at 57 ¶ 40.  Mr. Turley then instructed Plaintiff to attempt to reach out to other managers and upper management to "broker his own deal" with respect to a transfer.  *Id.* at 64 ¶ 49.

In May 2016, Plaintiff continued to request a transfer, and also requested permission to work from home more frequently.  Combined Statement 32-33, ¶¶ 65-67, ECF No. 86.  In a May 7, 2016 email to Mr. Turley, Plaintiff informed Mr. Turley that Plaintiff had "been on medication for years for stress/anxiety and this situation just makes things worse."  *Id.* at 57 ¶ 39 (quoting Pl.'s Concise Statement Ex. 29, ECF No. 71).  On May 24, 2016, Bradley Dixon, a member of the OIG's Reasonable Accommodations Committee, emailed Plaintiff to inform him that the Committee was aware that he had requested accommodations, and provided Plaintiff with instructions to move forward with that request.  Appendix Ex. MM at 4, ECF No. 63; *see also* Combined Statement 34 ¶ 68; 57 ¶ 41, ECF No. 86.  Mr. Dixon, in responding to inquiries set forth by Plaintiff in a reply email to Mr. Dixon that same day, informed Plaintiff that: (1) Ms. Pegram-Lewis had contacted the Employee Relations department to inform that department that Plaintiff had "mentioned a reasonable accommodation;" 2) that the Reasonable Accommodations Committee begins their reasonable accommodation process as soon as it is aware that an accommodation may be necessary, even if the employee has not formally requested the Committee do so; and (3) Plaintiff should follow the provided instructions should he feel that an accommodation was necessary to the performance of the essential functions of his position. Appendix Ex. MM at 3, ECF No. 63.  Plaintiff ultimately emailed Mr. Dixon on June 6, 2020 to state that he was "not going to pursue a reasonable accommodation at this time."  *Id.* at 2; *see also* Combined Statement 34 ¶ 68, ECF No. 86.

On September 7, 2016, following the teleconference with the MDD team discussed above, Plaintiff emailed Mr. Dixon to initiate a request for accommodations, and Mr. Dixon subsequently

provided Plaintiff with information and instructions regarding the submission of such a request. Combined Statement 34-35 ¶¶ 69, 71-72, ECF No. 86.  Plaintiff also emailed Ms. Pegram-Lewis on September 7, 2016 after the teleconference to inform her that he did not want to work at the Cost, Pricing, and Investments directorate due to stress.  *Id.* at 34, ¶ 70.  On October 3, 2016, Plaintiff sent an email to Mr. Dixon, Ms. Pegram-Lewis, and another OIG employee attaching a one-page letter from his psychiatrist, Manuel D. Reich, D.O., dated September 26, 2016 which explained that Plaintiff "holds a diagnosis of Major Depression ... and Post Traumatic Stress Disorder," and that Plaintiff's "symptoms tend to flare up when he feels threatened, which may trigger inappropriate behaviors," including "insistence, shouting, aggressive behavior, and disrespectfulness."  *Id.* at 35 ¶¶ 73-74 (quoting Appendix Ex. QQ, ECF No. 63).  The letter further explained:

> That Plaintiff "would like to have weekly meetings in order to voice his concerns and realities which feel important to him when he is conducting an audit as part of a team;" "[b]eing able to discuss his concerns with audit issues face to face will greatly reduce the likelihood of becoming stressed, and therefore, behaving in an inappropriate manner;" "[o]ne possible way to avoid stress for [Plaintiff] while he is at work is to have him assigned to the Decision Analysis Report Review function;" and Plaintiff "will need three hours of released time per week to enable him to attend psychotherapy sessions on a weekly basis."

*Id.* at 36 ¶ 75 (quoting Appendix Ex. QQ, ECF No. 63).

In response to an email from Mr. Dixon inquiring as to what accommodations Plaintiff was specifically requesting, Plaintiff reiterated that his requested accommodations were set forth in Dr. Reich's letter, and also stated that his "condition is made worse because [he is] alone in Pittsburgh with no other co-workers in his directorate to work with and no manager to discuss things with face to face."  Combined Statement 37-38 ¶ 78 ECF No. 86 (quoting Appendix Ex. II, ECF No. 63).  On October 6, 2016, Plaintiff, Mr. Dixon, Ms. Pegram-Lewis, and other members of the Reasonable Accommodations Committee participated in a conference call to discuss Plaintiff's

requested accommodations. *Id.* at 37 ¶ 79. On October 19, 2016, the Reasonable Accommodations Committee provided its written decision regarding Plaintiff's request for accommodations to Plaintiff, and approved the following accommodations: (1) three hours of leave each week to attend psychotherapy sessions; (2) weekly meetings with his managers to discuss issues and concerns while working on an audit as part of a team; (3) permission to use video teleconferencing methods while participating in team meetings from a remote location; (4) permission to take a break or walk away when presented with frustrating situations or confrontations; (5) scheduled technology training for Plaintiff's  team regarding video teleconferencing; and (6) Plaintiff's managers would be instructed to call for breaks when Plaintiff's behavior began to escalate or become inappropriate. *Id.* at 37-38, ¶ 80. Plaintiff was also offered the opportunity to relocate to OIG's headquarters in Rosslyn, VA, but Plaintiff declined that offer. *Id.* at 38, ¶ 81. Plaintiff's request to work solely on the Decision Analysis Report Review was denied. *Id.* at 38-39, ¶ 82. Plaintiff found the accommodations that allowed him to take personal leave and to walk away when presented with frustrating situations helpful. *Id.* at 39 ¶ 83.

Four OIG employees, each of whom was over the age of forty, received transfers in Fiscal Years 2016 and 2017 to directorates in offices other than the Pittsburgh Office. Combined Statement 41 ¶ 88 ECF No. 86. The OIG underwent another reorganization in October 2017, which included separating the Cost, Pricing and Investments directorate into two separate directorates, namely (1) Cost and Pricing and (2) Major Investments. *Id.* at 5 ¶ 13. Plaintiff was assigned to the Cost and Pricing directorate. *Id.* at 5 ¶ 14. Plaintiff was the only Pittsburgh-based employee assigned to the Cost and Pricing Directorate. Appendix Ex. B at 6, ECF No. 63. All of the OIG employees who were reassigned to the Major Investments directorate upon its creation in

2017 were stationed in OIG offices other than the Pittsburgh Office.  Pl.'s Concise Statement Ex. 2 at 103:16-104:25, ECF No. 71; Pl.'s Concise Statement Ex. 1 at 203:24-204:4, ECF No. 71.  One of the individuals reassigned to the Major Investments directorate in 2017 is older than Plaintiff. Combined Statement 43 ¶ 95, ECF No. 86.  In October 2018, Plaintiff was transferred to the OIG's Network Processing directorate, and is no longer the only member of his directorate stationed in Pittsburgh.  *Id.* at 43 ¶ 98.

Plaintiff first contacted the EEO on November 8, 2016 to allege that he had been discriminated against based upon his mental disabilities.[9]  Combined Statement 43 ¶ 96, ECF No. 86.  An EEO Alternative Dispute Resolution Specialist's (ADRS) Inquiry Report pertaining to Plaintiff provides:

> Counselee alleged he was discriminated against based on his mental disability (Post Traumatic Stress Disorder) and non-EEO related reprisal (threatened to contact Congress and outside agencies) when on November 8, 2016, counselee received a lower than expected end of year evaluation.  He also alleged on September 15, 2016, he was issued a Letter of Warning.

> NOTE: In Formal complaint, counselee added age as an additional purview.

Appendix Ex. VV, ECF No. 63.

### E.  Procedural History

Plaintiff filed complaints with the EEO on February 6, 2017 and November 11, 2017, and received Final Agency Action letters from the United States Postal Service with respect to these complaints on June 8, 2018 and December 6, 2018.  Compl. 5-6 ¶¶ 13-17, ECF No. 35.  Plaintiff filed his operative Second Amended Complaint on March 17, 2019.  Defendant filed an Answer (ECF No. 36) to the Complaint on March 29, 2019.  Defendant filed her Motion for Summary

---

[9] Plaintiff admits that he first contacted the EEO on November 8, 2016, but avers that he first communicated his intent to file an EEO claim on September 7, 2016, citing to an email dated September 7, 2016 to Julie Wong wherein he expressed concerns regarding his work environment and stated that he intended to pursue reasonable accommodations with the EEO.  Combined Statement 43 ¶ 96 (citing Pl.'s Concise Statement Ex. 12, ECF No. 71).

Judgment on January 7, 2020, along with a Brief in Support (ECF No. 61), a Concise Statement of Material Facts (ECF No. 62), and an Appendix of Exhibits (ECF No. 63).  On February 24, 2020, Plaintiff filed a Brief in Opposition (ECF No. 70) to Defendant's Motion, a Concise Statement of Material Facts (ECF No. 71), and a Response to Defendant's Concise Statement (ECF No. 72).   On March 16, 2020, Defendant filed a Reply (ECF No. 76), a Response to Plaintiff's Concise Statement (ECF No. 77), and an Appendix to Defendant's Reply (ECF No. 78).   After seeking, *see* Mot., ECF No. 79, and being granted, *see* Order, ECF No. 80, leave to file a Surreply in this matter, Plaintiff filed his Surreply (ECF No. 81), along with an Appendix thereto (ECF No. 82) and a Supplemental Response (ECF No. 83) to Defendant's Response to Plaintiff's Concise Statement, on March 31, 2020.   The parties filed their Combined Concise Statement of Material Facts on April 3, 2020.

## II.      Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict

for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51

(2000) (citing decisions); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248–19 (1986); *Simpson v.*

*Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for

summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the

outcome of the suit under the governing substantive law—will preclude the entry of summary

judgment.  *Liberty Lobby*, 477 U.S. at 248.

## III.    Discussion

Defendant asserts that summary judgment in Defendant's favor as to each of Plaintiff's

claims is appropriate because: (1) Plaintiff's request for a transfer was not a reasonable

accommodation, Br. in Supp. 6, ECF No. 61; (2) the OIG had legitimate, non-retaliatory reasons

for taking the alleged adverse actions at issue, and Plaintiff cannot establish pretext, *id.* at 10; (3)

Plaintiff cannot establish discrimination under the ADEA because there is no evidence to support

Plaintiff's assertion that his age was a motivating factor with respect to the OIG's issuance of the

Letter of Warning, rejection of Plaintiff's transfer requests, and/or issuance of the negative 2016

Performance Review, *id.* at 16-17; and (4) Plaintiff's retaliation claim under the ADEA fails

because he cannot establish that he engaged in ADEA-protected activity before the asserted

adverse action and cannot establish that the asserted adverse action was caused by the protected

activity, *id.* at 19-20.

### A.  Plaintiff's Claim for Discrimination Under the Rehabilitation Act (Count I)

Plaintiff asserts that Defendant failed to reasonably accommodate Plaintiff's disabilities

"by failing to provide Plaintiff with a transfer to another directorate which had personnel in

Plaintiff's Pittsburgh office (despite having a funded, vacant position available), and in failing to

accommodate Plaintiff by penalizing Plaintiff for his disabilities in his end of year review for 2016." Br. in Opp'n 19, ECF No. 70. Defendant argues that Plaintiff cannot make out a prima facie discrimination claim under the Rehabilitation Act for failure to accommodate based upon Plaintiff's transfer requests because Plaintiff's proposed accommodation, a transfer to "another directorate in which he would have coworkers to collaborate in-person," Combined Statement 72 ¶ 62, ECF No. 86, was not a reasonable accommodation as a matter of law under the Rehabilitation Act, Br. in Supp. 6, ECF No. 61. The Court agrees that Plaintiff's requests for transfer were unreasonable as a matter of law under clear Third Circuit precedent for two reasons. First, a request for a transfer that is motivated solely by a desire avoid certain individuals or situations that cause an individual stress are unreasonable as a matter of law. Second, Plaintiff has not identified an appropriate vacant, funded position to which he could have been reassigned.

The Rehabilitation Act applies only to federal employers and employers who receive federal funding, and "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." *Shiring v. Runyon*, 90 F.3d 827, 830-31 (3d Cir. 1996).[10] The United States Court of Appeals for the Third Circuit has explained:

> In order for an employee to make out a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating (1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job. The plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer.

---

[10] The Court notes that "[w]hether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." *McDonald v. Com. of Pa., Dep't of Pub. Welfare, Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995) (citing *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995)

*Shiring*, 90 F.3d at 831.   The issue of whether Plaintiff's transfer requests constitute requests for reasonable accommodations turns on whether the second requirement is satisfied, specifically whether Plaintiff is a "qualified individual."   *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).   An employee bears the burden of establishing that they are a qualified individual. *Gaul*, 134 F.3d at 580.   In *Gaul*, the United States Court of Appeals for the Third Circuit explained:

> A two-part test is used to determine whether someone is "a qualified individual with a disability." 29 C.F.R. pt. 1630, App. at 353–54.  First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."  *Id.* at 353.   Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation."  *Id.*  "The determination of whether an individual with a disability is qualified is made at the time of the employment decision."  *Id.* at 353–54; *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996).

*Id.*   An employee can satisfy his or her burden of establishing that the employee can perform the essential functions with reasonable accommodation by making a facial showing that the proposed accommodation was possible.  *Id.*

With respect to transfer requests as proposed accommodations, the Third Circuit has explained:

> An employer's obligation to provide a reasonable accommodation does not require the employer to create a new job.  *Mengine v. Runyon*, 114 F.3d 415, 417 (3d Cir. 1997).   However, an employer may be required to transfer an employee to an existing position.  *Mengine*, 114 F.3d at 418; *Shiring*, 90 F.3d at 832.   In such a failure-to-transfer case, the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation.  If the employee meets his burden, the employer must demonstrate that transferring the employee would cause unreasonable hardship.  *Id.*

*Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000).

In *Gaul*, a plaintiff employee who had been diagnosed with "depression, anxiety, and obsessive/compulsive personality," and who had suffered nervous breakdowns in the past, experienced difficulty working alongside a certain coworker upon being assigned by his employer, AT & T, to a new project. *Gaul*, 134 F.3d at 578.  The plaintiff employee made several complaints about this situation, ultimately culminating in a meeting wherein the plaintiff informed his department head that he was "stressed out" and suggested that the department head move plaintiff to a different project. *Id*.  The defendant employer ignored this request, and the plaintiff went on disability leave thereafter and eventually filed suit against the employer. *Id*.  The Third Circuit ultimately affirmed the district court's decision to grant summary judgment in the employer's favor.  The Third Circuit found that the plaintiff employee failed to meet his burden of establishing that the proposed accommodation was possible because the employee's proposed accommodation, a transfer to a "lower-stress position," was unreasonable as a matter of law for the following reasons:

> First, Gaul's proposed accommodation would impose a wholly impractical obligation on AT & T or any employer.  Indeed, AT & T could never achieve more than temporary compliance because compliance would depend entirely on Gaul's stress level at any given moment.  This, in turn, would depend on an infinite number of variables, few of which AT & T controls.  Moreover, the term "prolonged and inordinate stress" is not only subject to constant change, it is also subject to tremendous abuse.  The only certainty for AT & T would be its obligation to transfer Gaul to another department whenever he becomes "stressed out" by a coworker or supervisor.  It is difficult to imagine a more amorphous "standard" to impose on an employer.

> Second, Gaul's proposed accommodation would also impose extraordinary administrative burdens on AT & T.  In order to reduce Gaul's exposure to coworkers who cause him prolonged and inordinate stress, AT & T supervisors would have to consider, among other things, Gaul's stress level whenever assigning projects to workers or teams, changing work locations, or planning social events.  Such considerations would require far too much oversight and are simply not required under law.

Third, by asking to be transferred away from individuals who cause him prolonged and inordinate stress, Gaul is essentially asking this court to establish the conditions of his employment, most notably, with whom he will work. However, "[n]othing in the ADA allows this shift in responsibility." [*Weiler v. Household Finance Corp.*, 101 F.3d 519, 526 (7th Cir.1996)]. "Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons." *Wernick v. Federal Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir.1996)

*Gaul*, 134 F.3d at 581.

Plaintiff's transfer requests[11] in the present case are substantively identical to the transfer request at issue in *Gaul*. In challenging his working conditions and requesting a transfer to a different directorate, Plaintiff consistently cited his mental health conditions and the stress caused by working in a new, unfamiliar directorate without the ability to collaborate with co-workers in person as the driving motivation warranting a transfer. *See* Pl.'s Concise Statement Ex. 1 at 147:3-6, ECF No. 71 (Plaintiff's deposition testimony providing: "[t]he whole time I wanted a reasonable accommodation, in the back of my mind it's because I'm stressed, but it's also because I want to work with other people because I know I won't get stressed."); Pl.'s Concise Statement Ex. 29, ECF No. 71 (Plaintiff's May 7, 2016 email to Mr. Turley stating that Plaintiff had "been on medication for years for stress/anxiety and this situation just makes things worse."); Pl.'s Concise Statement Ex. 12, ECF No. 71 (Plaintiff's September 7, 2016 email to Ms. Wong wherein he stated that he would contact the Workplace Environment team within the Special Inquiries Division of the OIG regarding concerns arising from his purportedly "tense, stressful, and intimidating work environment."); Appendix Ex. NN, ECF No. 63 (Plaintiff's September 9, 2016 email to Ms.

---

[11] The Court notes that Defendant asserts that Plaintiff made only one formal request for accommodations in the fall of 2016, and Plaintiff asserts that he made several requests for transfer between 2016 and 2018. The number of requests is ultimately irrelevant because the motivation for any of Plaintiff's purported requested transfers renders the requests unreasonable as a matter of law, and further because, as discussed in further detail below, Plaintiff has identified only a single vacant position to which he could have been transferred in 2017.

Pegram-Lewis providing "I can no longer tolerate being in this directorate. There is entirely too much stress.  This is a result of a number of things but mostly because I do not feel a part of the team."); Appendix Ex. QQ, ECF No. 63 (Plaintiff's psychiatrist's letter in support of his formal accommodations request providing: "[Plaintiff's] basic problem that he feels needs remediated is his feelings of being unheard, especially when working remotely.  He believes he is not able to have physical interactions with others, which lead to his feelings of *anxiety and stress*, which build to levels that result in inappropriate behaviors.  *Being able to communicate and discuss his concerns with audit issues face to face will greatly reduce the likelihood of becoming stressed*, and therefore, behaving in an inappropriate manner.  *One possible way to avoid stress* for [Plaintiff] while he is at work is to have him assigned to the Decision Analysis Report Review function." (emphasis added)).

The only reasonable interpretation of the record before the Court is that Plaintiff's primary motivation behind his requests for transfer was to work in a less stressful environment.  In opposing Defendant's Motion for Summary Judgment, Plaintiff argues that Defendant's Employee Relations department has admitted that Defendant does, in some situations, consider transfers to be a reasonable accommodation.  Br. in Opp'n 22, ECF No. 70.  The Court notes that *Gaul* does not stand for the proposition that *all* requests for transfer are unreasonable requests for accommodation.  Rather, *Gaul* provides that transfer requests such as those at issue in this case, where a plaintiff merely seeks a transfer to a position that is less stress- and anxiety-inducing, are unreasonable as a matter of law.  Each of the concerns raised in *Gaul* apply to Plaintiff's transfer requests, specifically that such an accommodation in this instance would: 1) result in only temporary compliance by Defendant because the accommodation is based entirely on Plaintiff's

stress level at any given moment;[12] 2) require Defendant to consider, inter alia, Plaintiff's stress level whenever assigning projects to workers or teams, changing work locations, or transferring OIG employees out of or into the Pittsburgh Office and/or between directorates, whether by request or pursuant to an OIG-wide reorganization; and 3) impermissibly allow Plaintiff and the court to set the conditions of the Plaintiff's employment, "most notably, with whom he will work." *Gaul*, 134 F.3d at 581. For the reasons discussed above, Plaintiff's requests to transfer to a different directorate were unreasonable as a matter of law, and cannot form the basis of his failure to accommodate claim at Count I.

Moreover, in arguing that there was a vacant, funded position that Plaintiff could have been transferred to, Plaintiff asserts that, in 2017, Plaintiff could have been assigned to the newly formed Major Investment directorate during an October 2017 OIG-wide reorganization. Br. in Opp'n 22, ECF No. 70; *see also* Combined Statement 73 ¶ 64, ECF No. 86. The October 2017 vacancy created by the formation of the Major Investments directorate is the only vacant, funded position Plaintiff has specifically identified. This is significant because no employees stationed in the Pittsburgh Office were assigned to the Major Investments directorate in 2017, and each of the employees assigned to this directorate worked in an OIG office other than the Pittsburgh Office. Pl.'s Concise Statement Ex. 2 at 103:16-104:25, ECF No. 71; Pl.'s Concise Statement Ex. 1 at 203:24-204:4, ECF No. 71. As such, Plaintiff essentially asserts that he should have been reassigned or transferred to a directorate that very clearly featured the most frequently and explicitly cited basis for his requests to be transferred from his then-position, namely an inability

---

[12] This is especially true in this case where the only vacant, funded position Plaintiff has specifically identified was a position in the newly formed Major Investment directorate during an October 2017 OIG-wide reorganization. Br. in Opp'n 22, ECF No. 70. Importantly, no Pittsburgh-stationed OIG employees were assigned to this directorate. *See* Pl.'s Concise Statement Ex. 2 at 103:16-104:25, ECF No. 71; Pl.'s Concise Statement Ex. 1 at 203:24-204:4, ECF No. 71. Accordingly, Plaintiff's primary stressor, the inability to collaborate with coworkers in person in the Pittsburgh Office, would not have been alleviated by a transfer to the Major Investments directorate.

to collaborate and work face-to-face with other directorate team members in the Pittsburgh Office. *See* Combined Statement 72 ¶ 62, ECF No. 86 ("Plaintiff sought a transfer not to another office, but to another directorate in which he would have coworkers to collaborate in-person.  The lack of face-to-face collaboration triggered his anxiety and depression . . . ." (citation omitted)); *see also* Appendix Ex. II; NN; QQ, ECF No. 63; Pl.'s Concise Statement Ex. 1 at 95:20-21; 147:3-6, ECF No. 71.

In a failure-to-transfer case, "the employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing." *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997) (citing *Shiring*, 90 F.3d at 832).  The Third Circuit has explained:

> [I]n a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant—even if it also appears that the defendant failed to engage in good faith in the interactive process.

*Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000).

The 2017 vacancy in the Major Investments directorate, which, again, is the only vacant position explicitly identified by Plaintiff, was not an appropriate vacant, funded position because it does not comply with the basis for Plaintiff's transfer requests, namely that he be transferred to a position where: 1) he would be able to collaborate face-to-face with coworkers assigned to the same directorate in the Pittsburgh Office; and 2) not be required to exclusively collaborate with coworkers who are stationed in offices other than the Pittsburgh Office.[13]  *See Lampkin v. Donahoe*, Civil Action No. 14-5686 (MAS) (DEA), 2016 WL 7030430, at *18 (D.N.J. Dec. 1, 2016) ("Here, Plaintiff fails to make a facial showing that a vacant, funded position existed, *which*

---

[13] The Court again notes that Plaintiff asserts that Defendant failed to reasonably accommodate Plaintiff's disabilities "by failing to provide Plaintiff with a transfer to another directorate which had personnel in Plaintiff's Pittsburgh [O]ffice (despite having a funded, vacant position available) . . . ."  Br. in Opp'n 19, ECF No. 70.

*complied with the medical restrictions she submitted to Defendant*." (emphasis added)).  Plaintiff cannot establish that he was qualified to perform the essential duties with reasonable accommodation of a vacant, funded position by identifying a vacant position that does not comply with the clear basis for accommodations cited by Plaintiff in requesting a transfer.  *See Gaul*, 134 F.3d at 580 (an employee can satisfy his or her burden of establishing that the employee can perform the essential functions of a position with reasonable accommodation by making "a facial showing that his proposed accommodation is possible.").  Accordingly, the Court finds that Plaintiff's failure to identify an appropriate vacant, funded position also warrants summary judgment in Defendant's favor with respect to Plaintiff's claim for discrimination under the Rehabilitation Act to the extent that claim is based upon Defendant's failure to transfer Plaintiff to another directorate.  For all of the reasons discussed above, the Court finds that Plaintiff's transfer requests constitute unreasonable requests for accommodations, and therefore cannot form the basis of Plaintiff's claim for discrimination based upon a failure to accommodate under the Rehabilitation Act.

Plaintiff further asserts that Defendant failed to accommodate Plaintiff by "penalizing Plaintiff for his disabilities in [the 2016 Performance Review]."  Br. in Opp'n 19, ECF No. 70. With respect to this assertion, the Court notes that "[t]he Equal Employment Opportunity Commission's ("EEOC") Enforcement Guidance makes clear that the requirement to provide reasonable accommodations under the ADAAA is 'always prospective,' and that 'an employer is not required to excuse past misconduct even if it is the result of the individual's disability.'"  *Katz v. UPMC*, No. 2:16cv1627, 2019 WL 3843041, at *8 (W.D. Pa. Aug. 15, 2019) (quoting *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017)).  "[A]n employee may request a reasonable accommodation after an employer indicates it has performance concerns, as an

employee may not know or be willing to acknowledge that there is a problem requiring accommodation." *Katz*, 2019 WL 3843041, at *8.  Even if the employee does request such accommodations, "[t]he employer, however, is not required to terminate an ongoing disciplinary process based upon a post hoc request for reasonable accommodation." *Id*.

The record in the present case reflects that Plaintiff initially declined, on June 6, 2016, to pursue accommodations when contacted by the OIG's Reasonable Accommodations Committee.  *See* Appendix Ex. MM at 2, ECF No. 63 (Plaintiff indicating by email that he was "not going to pursue a reasonable accommodation at this time.").  On September 7, 2016, Plaintiff emailed Bradley Dixon of the Reasonable Accommodations Committee to initiate a request for accommodations, but after the second of two MDD audit project team teleconferences which are cited in the 2016 Performance Review as the basis for Plaintiff's failing grades.  Appendix Ex. H. at 3-5, ECF No. 63.  Because a request to excuse past misconduct is not a reasonable request for accommodation, even if that misconduct was the result of Plaintiff's disability, *Katz*, 2019 WL 3843041, at *8, Plaintiff's assertion that the failing grades set forth in the 2016 Performance Review, which cite to Plaintiff's actions while assigned to the MDD audit project, cannot form the basis of his failure to accommodate claim under the Rehabilitation Act.

For all of the reasons discussed above, the Court finds that Defendant has established that there is no genuine dispute about any material fact, and that judgment as a matter of law in Defendant's favor is warranted, with respect to Plaintiff's claim for discrimination under the Rehabilitation Act (Count I) based upon a failure to provide reasonable accommodations for Plaintiff's disabilities.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Count I.

The Court notes that Plaintiff has requested as follows: "[t]o the extent these failures to accommodate are not explicitly stated in Plaintiff's Second Amended Complaint, Plaintiff seeks leave of Court to [a]mend his Complaint to conform with the evidence."  Br. in Opp'n 19, ECF No. 70.  The Court has addressed the merits of Plaintiff's claim at Count I, and has determined, based upon the record before the Court, that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted in Defendant's favor as to Plaintiff's claim for discrimination under the Rehabilitation Act.  It is not a pleading deficiency that resulted in this determination, but rather an extensive review of the entire record before the Court.  Accordingly, the Court finds that there is no basis to permit Plaintiff leave to "amend his Complaint to conform with the evidence."  Accordingly, the Court will not permit leave to amend at this time, and will instead grant Defendant's Motion for Summary Judgment as to Count I.[14]

### B.  Plaintiff's Claim for Retaliation Under the Rehabilitation Act (Count II)

Defendant asserts that Plaintiff's claim for retaliation under the Rehabilitation Act (Count II) fails because the OIG had legitimate, non-retaliatory reasons for issuing the Letter of Warning and the failing grades set forth in the 2016 Performance Review, and because Plaintiff cannot establish that these reasons are pretextual.  Br. in Supp. 10, ECF No. 61.  To set forth a prima facie case of retaliation under the Rehabilitation Act, a plaintiff is required to show that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered a materially adverse action; and (3) "there is a causal connection between the adverse action and the protected activity."  *Kendall v. Postmaster Gen. of U.S.*, 543 F. App'x 141, 144 (3d Cir. 2013).  If a plaintiff establishes a prima facie case, then:

---

[14] To the extent that Plaintiff requests leave to amend any of his other claims, the Court finds that the same is not warranted with respect to Counts II and IV for the same reasons stated above, and that amendment should not be permitted as to Count III because Plaintiff has abandoned that claim for reasons discussed in further detail below.

> [T]he burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. . . .  If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

*Kondas v. Potter*, 328 F. App'x 116, 120 (3d Cir. 2009) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997)).  With respect to summary judgment in a retaliation case, the United States Court of Appeals for the Third Circuit has explained:

> To obtain summary judgment, the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process.  This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

*Krouse*, 126 F.3d at 501.

At this stage of the proceedings only, "Defendant concedes that Plaintiff may be able to establish a prima facie case of retaliation [under the Rehabilitation Act]."[15]  Br. in Supp. 11, ECF No. 61.  Plaintiff asserts that he engaged in protected activity "in notifying his supervisor [that Plaintiff] intended to file an EEO complaint, in filing the EEO complaint, and in seeking accommodations for his disabilities."  Br. in Opp'n 10, ECF No. 70.  Plaintiff further asserts that the Letter of Warning, the failing grades set forth in the 2016 Performance Review, and the OIG's failure to transfer him to a new directorate all constitute adverse actions by Defendant that were

---

[15] For purposes of Defendant's Motion for Summary Judgment only, Defendant also concedes that the Letter of Warning, the 2016 Performance Review, and/or denial of Plaintiff's transfer requests could constitute "adverse actions" under the ADEA.  Br. in Supp. 16 n.11, ECF No. 61.  Adverse action is a required element of a prima facie retaliation claim under both the ADEA and the Rehabilitation Act.  *See Kendall v. Postmaster Gen. of U.S.*, 543 F. App'x 141, 144 (3d Cir. 2013); *Cauler v. Lehigh Valley Hosp., Inc.*, 654 F. App'x 69, 72 (3d Cir. 2016).  The Court thus construes this concession to apply to both Plaintiff's claim for retaliation under the ADEA and his claim for retaliation under the Rehabilitation Act.

motivated by Plaintiff's protected activity.[16]  Combined Statement 43 ¶ 97, ECF No. 86.  In moving

for summary judgment, Defendant avers that the Letter of Warning and the 2016 Performance

Review were simply the result of Plaintiff's failure to adhere to the OIG's standards of conduct,

and that the disciplinary action and negative grading were thus supported by legitimate non-

retaliatory reasons and were not influenced by an improper motive.  Br. in Supp. 11-12, ECF No.

61.

Because Defendant concedes that Plaintiff has set forth a prima facie case of retaliation

under the Rehabilitation Act at this stage of the proceedings, Defendant bears the burden of setting

forth a legitimate, non-retaliatory reason for Defendant's adverse actions.  *Kondas v. Potter*, 328

F. App'x 116, 120 (3d Cir. 2009).  The Court finds that Defendant, in citing Plaintiff's conduct

during the September 1, 2016 and September 7, 2016 teleconferences with the MDD audit team,

has advanced legitimate, non-retaliatory reasons for Defendant's issuance of the Letter of Warning

and for the failing grades set forth in the 2016 Performance Review in the categories of

"Leadership and Professionalism" and "Flexibility."[17]  While Plaintiff denies that he became angry

or disrespectful during these teleconferences, *see* Combined Statement 11 ¶ 27; 13 ¶ 30, ECF No.

86, Plaintiff also admitted that, during the teleconferences, he raised his voice, said or did things

other participants may have taken personally, got "passionate," became "loud" and "more

---

[16] In the Combined Statement, Plaintiff avers that "Defendant also retaliated against Plaintiff by not transferring him to a new directorate when it is undisputed an appropriate vacancy presented itself."  Combined Statement 43 ¶ 97, ECF No. 86.  In so averring, Plaintiff cites to Mr. Cihota's testimony regarding the vacancy created by the formation of the Major Investment directorate in October 2017, which, again, is the only vacant, funded position explicitly identified by Plaintiff.  *Id.* (citing Pl.'s Concise Statement Ex. 2 at 103-104, ECF No. 71).  As such, the Court construes this averment to assert that Defendant retaliated against Plaintiff by not reassigning him to the Major Investments directorate in 2017.

[17] The " Flexibility" category of a performance review addresses whether an employee "[e]mbraces, champions[,] and is an agent of change," "[c]ontributes to change through ideas and leadership," and "[e]xhibits flexibility, adaptability[,] and resilience."  Resp. to Def.'s Statement Ex. 30 at 153.  The "Leadership and Professionalism" category looks into whether the employee "[d]emonstrates [l]eadership," "[d]evelops self and others," "[t]reats others as one likes to be treated," "[c]ollaborates and promotes teamwork in getting things done," and "[d]emonstrates positive interpersonal skills."  *Id.* at 149.

frustrated," and "came across poorly over the phone," *id.* at 15 ¶ 33.  Plaintiff apologized following his actions during the September 1, 2016 teleconference, during which witnesses observed that Plaintiff spoke "in a  frustrated tone,"  that Plaintiff was "upset," that there was "tension on [Plaintiff's] end," and that Plaintiff was "loud" and  "raise[d] his voice."  Appendix Ex. T, ECF No. 63.   Plaintiff's psychiatrist's letter in support of Plaintiff's request for accommodations provides that:

> [Plaintiff's] symptoms tend to flare up when he feels threatened, *which may trigger inappropriate behaviors*.  *He is aware that he becomes loud when this happens*, however, he experiences feeling unheard *which further provokes his insistence, shouting, aggressive behavior, and disrespectfulness*.  On a recent occasion, he had made threats about whistle blowing which is an unusual behavior for him. [Plaintiff] can now analyze after an unpleasant or uncomfortable experience that he is trying to gain a sense of power and control, and is aware that when he panics or feels threatened, he does not feel in control.  *He feels that he tries to establish power feelings to relieve fears that he knows are underneath the anxiety that provokes the loud, threatening behaviors that he exhibits*.
>
> [Plaintiff] is aware that he needs to develop different, more useful and effective coping mechanisms with which *to express concerns and disagreements with superiors and coworkers*.

Appendix Ex. QQ, ECF No. 63 (emphasis added).

 Plaintiff's conduct during the September 1, 2016 and September 7, 2016 teleconferences is explicitly identified in the Letter of Warning and the 2016 Performance Review as the primary motivation behind the issuance of the Letter of Warning and the failing grades set forth in the 2016 Performance Review.  Appendix Ex. F at 1-3, ECF No. 63; Appendix Ex. H. at 3-5, ECF No. 63. OIG policy, and specifically Employee and Labor Relations Manual § 665.16, requires that OIG employees be "courteous" and "maintain harmonious working relationships," and further requires that employees not "do anything that would contribute to an unpleasant working environment." Combined Statement 3-4 ¶ 9, ECF No. 86.  Even construing the above-cited evidence and facts in a light most favorable to Plaintiff, as the Court must do at this stage of the proceedings, it is clear

that Plaintiff's behavior during the September 1, 2016 and September 7, 2016 teleconferences with the MDD audit team, specifically shouting at coworkers due to his frustration with the MDD audit project, violated these requirements.

Even if Plaintiff did not personally attack anyone while voicing his frustrations during these teleconferences, the Court notes that Plaintiff acknowledged that he raised his voice, said or did things other participants may have taken personally, got "passionate," became "loud" and "more frustrated," and "came across poorly over the phone" during the September 1, 2016 and September 7, 2016 teleconferences.[18]  Combined Statement 15 ¶ 33, ECF No. 86.  Defendant would certainly be warranted in finding that such conduct was not "courteous," and that Plaintiff's conduct during the teleconferences resulted in a failure to "maintain harmonious working relationships" and that his actions were actions "that would contribute to an unpleasant working environment."  As such, Defendant has advanced a legitimate, non-retaliatory reason supporting the Letter of Warning. Further, as noted in the 2016 Performance Review, Plaintiff's conduct during the September 1, 2016 and September 7, 2016 teleconferences displayed Plaintiff's failure to adapt to the new MDD audit project, and further displayed a failure to collaborate in a positive interpersonal manner with his coworkers, thus warranting the failing grades in the "Flexibility" and "Leadership and Professionalism" categories of the 2016 Performance Review.  Accordingly, for these reasons, the Court finds that Defendant has set forth legitimate, non-retaliatory reasons for the issuance of the disciplinary Letter of Warning and the failing grades set forth in the 2016 Performance Review.

---

[18] The Court notes that Plaintiff's psychiatrist's letter acknowledges that "[Plaintiff] is aware that he becomes loud when [he feels threatened], however, he experiences feeling unheard which further provokes his insistence, shouting, aggressive behavior, and disrespectfulness."  Appendix Ex. QQ, ECF No. 63.  This statement, construed in conjunction with Plaintiff's admissions regarding his conduct during the September  1, 2016 and September 7, 2016 teleconferences, supports, at minimum, an inference that Plaintiff may be perceived by others as "aggressive" and "disrespectful" when he "becomes loud," as he did during the teleconferences.

Having so held, Plaintiff bears the burden of establishing that Defendant's citation to Plaintiff's conduct during the September 1, 2016 and September 7, 2016 teleconferences was merely pretext for retaliation against Plaintiff, and that the true reason Defendant issued the Letter of Warning and the failed 2016 Performance Review is because Plaintiff engaged in protected activity under the Rehabilitation Act. *Kondas*, 328 F. App'x at 120. "In proving pretext, a plaintiff may survive a motion for summary judgment 'by either (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Wright v. Providence Care Ctr.*, LLC, No. 2:17-CV-00747-NR, 2019 WL 4643592, at *7 (W.D. Pa. Sept. 24, 2019), *aff'd*, No. 19-3247, 2020 WL 4581246 (3d Cir. Aug. 10, 2020) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Walker v. U.S. Sec'y of the Air Force*, 7 F. Supp. 3d 438, 458 (D.N.J. 2014) (a plaintiff can establish pretext "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' . . . ." (quoting *Fuentes*, 32 F.3d at 765)). "Moreover, [a plaintiff] must do more than demonstrate that [the defendant's] basis for [the plaintiff's] termination was incorrect or mistaken, 'since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Neidigh v. Select Specialty Hospital–McKeesport*, 150 F. Supp. 3d 573, 579 (W.D. Pa. 2015), *aff'd sub nom. Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217 (3d Cir. 2016) (quoting *Fuentes*, 32 F.3d at 765)).

Plaintiff alleges that he filed his first formal EEO Complaint of Discrimination on February 6, 2017.  Compl. ¶ 13, ECF No. 35.  The Letter of Warning is dated September 15, 2016, *see*

Appendix Ex. F, ECF No. 63, the 2016 Performance Review was signed by Ms. Pegram-Lewis on November 9, 2016, and the appeal of the 2016 Performance Review was completed on December 1, 2016, *see* Appendix Ex. H, ECF No. 63.  Accordingly, the filing of Plaintiff's formal EEO complaint cannot form the basis of a retaliation claim arising from the issuance of the Letter of Warning and the 2016 Performance Review, and the Court need not consider whether Defendant's legitimate, non-retaliatory reason is merely pretext for retaliation based upon the filing of Plaintiff's EEO Complaint.[19]

In arguing that Defendant's proffered legitimate, non-retaliatory reasons supporting the Letter of Warning and the 2016 Performance Review are merely pretext, Plaintiff also relies on Plaintiff's purported September 7, 2016 notification to "his supervisor [that Plaintiff] intended to file an EEO complaint."  Br. in Opp'n 10, ECF No. 70.  Plaintiff is clearly referencing a September 7, 2016 email to Ms. Wong wherein he stated that he would contact the Workplace Environment team within the Special Inquiries Division of the OIG regarding concerns arising from his purportedly "tense, stressful, and intimidating work environment," and further stated that he intended to pursue reasonable accommodations with the EEO.  Combined Statement 62-63 ¶ 47,

---

[19] The Court notes that Plaintiff first contacted the EEO with respect to discrimination based upon his disabilities on November 8, 2016.  *See* Combined Statement 43 ¶ 96, ECF No. 86.  An EEO Alternative Dispute Resolution Specialist's (ADRS) Inquiry Report pertaining to Plaintiff provides:

> Counselee alleged he was discriminated against based on his mental disability (Post Traumatic Stress Disorder) and non-EEO related reprisal (threatened to contact Congress and outside agencies) when on November 8, 2016, counselee received a lower than expected end of year evaluation.  He also alleged on September 15, 2016, he was issued a Letter of Warning.

> NOTE: In Formal complaint, counselee added age as an additional purview.

Appendix Ex. VV, ECF No. 63.  This Report also plainly indicates that Plaintiff did not contact the EEO until *after* he had received the 2016 Performance Review on November 8, 2016.  *Id.*  Given this timeline, Plaintiff's contact with the EEO could, potentially, form the basis of a retaliation claim for the denial of Plaintiff' appeal of the 2016 Performance Review, but not for the initial issuance of the 2016 Performance Review.  This is ultimately of no consequence because, as discussed in further detail below, Plaintiff fails to set forth any basis for a finding of pretext in this case.

ECF No. 86; *see also* Pl.'s Concise Statement Ex. 12, ECF No. 71.  While this email references the EEO, it does not explicitly state that Plaintiff intended to file a complaint with the EEO; but, rather indicates that Plaintiff intended to pursue accommodations, presumably for his disabilities, from the EEO.  *Id.*  In the September 7, 2020 email, Plaintiff specifically highlighted, and noted that he highlighted, text which indicates that he believed his work environment was a "tense, stressful, and intimidating work environment," and notably did not highlight text which could have indicated that he had experienced "discrimination" in his work environment.[20]    Because "[p]rotected activity 'includes retaliation against an employee for requesting an accommodation[,]" *Barber v. Subway*, 131 F. Supp. 3d 321, 329 (M.D. Pa. 2015) (quoting *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188–89 (3d Cir. 2010)), this email constitutes protected activity under the Rehabilitation Act.  While this email clearly put Defendant on notice that Plaintiff intended to seek accommodations, the Court finds that Plaintiff's citation to this email as an explicit threat to file an "EEO Complaint of Discrimination in the Postal Service" is strained and not warranted based on the above.  As such, the Court will consider whether Plaintiff's requests for accommodations and notice to Defendant of his intent to pursue the same were the true reason behind the Letter of Warning and the failing grades set forth in the 2016 Performance Review.

In arguing that the Letter of Warning was motivated by retaliatory animus as opposed to Plaintiff's conduct during the September 1, 2016 and September 7, 2016 MDD audit team teleconferences, Plaintiff primarily asserts that Ms. Pegram-Lewis's investigation into these teleconferences was faulty, and that the timing of the issuance of the Letter of Warning was

---

[20] The second half of Plaintiff's email to Ms. Wong clearly contains quoted language from the OIG's policy regarding its response to allegations made by employees with respect to the OIG "Workplace Environment."  *See* Pl.'s Concise Statement Ex. 12, ECF No. 71 ("This section establishes policy for OIG response to workplace environment allegations by OIG and Postal Service employees . . . .").  This quoted language includes a numbered list of ten different workplace allegations employees can report, including "discrimination" and "tense, stressful, and intimidating work environment."  *Id.*

suspicious.  Br. in Opp'n 11-12, ECF No.70.  In so arguing, Plaintiff cites to an email between each of his supervisors wherein Mr. Turley instructed Ms. Pegram-Lewis to initiate an investigation to look into, among other things, whether "this behavior has been previously discussed" with Plaintiff.  *Id.* at 12.  Plaintiff characterizes this email as an attempt to "dig up dirt on Plaintiff," and asserts that the timing of the email, i.e. the same day he sent his email to Ms. Wong informing her of his intent to pursue EEO accommodations, is suspicious.  *Id.*

"A plaintiff cannot merely ask a factfinder to draw inferences from temporal proximity or holes in the employer's proffered nondiscriminatory reason." *Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 66 (3d Cir. 2019).  While Plaintiff is correct that both his email to Ms. Wong regarding Plaintiff's intention to seek accommodations and the email between his supervisors described above occurred on the same day, Plaintiff omits the fact that each of these emails was sent on September 7, 2016, i.e. the date of the second of two MDD audit team teleconferences during which Plaintiff admits that he raised his voice, said or did things other participants may have taken personally, got "passionate," became "loud" and "more frustrated," and "came across poorly over the phone."  Combined Statement 15 ¶ 33, ECF No. 86.  Further, each of these emails was sent *after* the September 7, 2016 teleconference.  *Id.* at 62-63 ¶ 47.  The Court finds that the timing of the email between Plaintiff's supervisors which initiated an investigation into Plaintiff's "behavior" is most readily and reasonably explained by the fact that the September 7, 2016 teleconference had just taken place, and further finds that the email's reference to "this behavior" can only reasonably be interpreted to be a reference to Plaintiff's potentially discipline-worthy conduct during the September 1, 2016 and September 7, 2016  teleconferences.  Rather than contradict or undermine Defendant's proffered legitimate, non-retaliatory reason for the Letter of Warning, this email tends to establish that Plaintiff's supervisors found Plaintiff's conduct during

these teleconferences to rise to a level warranting investigation.  Accordingly, the Court finds that the timing of the Letter of Warning in relation to Plaintiff's email to Ms. Wong and the email between Plaintiff's supervisors does not render Defendant's legitimate, non-retaliatory reason unworthy of credence.

To the extent that Plaintiff asserts that Ms. Pegram-Lewis inadequately investigated the September 1, 2016 and September 7, 2016 teleconferences before issuing the Letter of Warning, the Court notes that "the fact that a company conducted an inadequate investigation of employee misconduct or failed to interview an employee during an internal investigation, without more, is not sufficient to raise an inference of discrimination." *Epps v. First Energy Nuclear Operating Co.*, No. CIV.A. 11-1462, 2013 WL 1216858, at *29 (W.D. Pa. Mar. 25, 2013) (citing *Geddis v. University of Delaware*, 40 F. App'x 650, 653 (3d Cir.2002); *Glenn v. Raymour and Flanigan*, 832 F.Supp.2d 539, 553 (E.D.Pa. Dec.22, 2011)).  As stated above, Ms. Pegram-Lewis, after gathering facts and engaging in conversations with the Office of General Counsel's Employee Relations department regarding the September 1, 2016 and September 7, 2016 teleconferences, was authorized by Mr. Cihota, Plaintiff's fourth-line supervisor, to make a decision regarding whether to take disciplinary action against Plaintiff on September 12, 2016.  Combined Statement 18-20 ¶¶ 38-41, ECF No. 86.  On September 21, 2016, Ms. Pegram-Lewis emailed an official Letter of Warning dated September 15, 2016 to Plaintiff which cited Plaintiff's conduct during the teleconferences.  *Id.* at 21 ¶ 45.  Plaintiff has largely acknowledged his conduct during the teleconferences, *see* Combined Statement 15 ¶ 33, ECF No. 86, and Ms. Pegram-Lewis's failure to interview every witness that Plaintiff believes should have been interviewed is not sufficient to establish pretext.

Plaintiff also asserts that other OIG employees who had not sought accommodations, and specifically Mr. Turley, were treated differently, i.e. not issued letters of warning, for behavior similar to that of Plaintiff's during the September 1, 2016 and September 7, 2016 teleconferences.[21] Br. in Opp'n 15-16, ECF No. 70.  A plaintiff can show pretext by introducing sufficient evidence that "the employer has previously treated more favorably similarly situated persons who did not engage in the protected activity at issue." *Sawa v. RDG-GCS Joint Ventures III*, No. CV 15-6585, 2017 WL 3033996, at *21 (E.D. Pa. July 14, 2017) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998)).   "[T]o be valid comparators, the other employees must be 'similarly situated in all respects,' including having dealt with the same supervisor, being subjected to the same standard, and engaging in the same conduct." *Wright*, 2019 WL 4643592, at *9 (quoting *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)).

Plaintiff cites to no evidence which would allow a reasonable factfinder to conclude that Mr. Turley worked under the same supervisor, or, for that matter, that Mr. Turley and Plaintiff occupied the same rank at the time of each of their purported violations,  or that their conduct was sufficiently similar such that they are appropriate comparators. *See* Br. in Supp. 15, ECF No. 61("There is no record of another audit evaluator yelling at . . . his coworkers, . . . let alone one in the same directorate, with the same supervisors, who did not receive any discipline for his actions.").  As Mr. Turley is the only comparator cited by Plaintiff, and because Mr. Turley is not an appropriate comparator, there is no basis for a reasonable factfinder to conclude that similarly situated employees who did not seek accommodations were treated differently than Plaintiff for

---

[21] Plaintiff also argues that his conduct during the September 1, 2016 and September 7, 2016 teleconferences was not discipline-worthy.  Br. in Opp'n 15-16, ECF No. 70.  The Court rejects this argument for the same reasons it found that Defendant has advanced a legitimate, non-retaliatory reason for the Letter of Warning and the 2016 Performance Review.  Moreover, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

sufficiently similar conduct.  For all of the reasons discussed above, the Court finds that no reasonable factfinder could conclude that Defendant's legitimate, non-retaliatory reason for issuing the Letter of Warning was pretext for retaliation, and, thus, further finds that the Letter of Warning cannot serve as the basis for Plaintiff's claim for retaliation under the Rehabilitation Act.

With respect to the 2016 Performance Review, Plaintiff argues that Defendant's citation to his conduct during the September 1, 2016 and September 7, 2016 teleconferences was pretext for retaliation because: 1) Defendant was incorrect to issue him failing grades in the categories of "Leadership and Professionalism" and "Flexibility," Br. in Opp'n 12, ECF No. 70; 2) Ms. Pegram-Lewis did not interview enough of Plaintiff's managers in preparing the 2016 Performance Review, *id.* at 13-14; and 3) Mr. Turley should not have participated in the appeal of the 2016 Performance Review, *id.* at 14.

With respect to the first two arguments raised by Plaintiff, the Court notes that "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  The Court notes that it has already found that Plaintiff's conduct during the September 1, 2016 and September 7, 2016 teleconferences is a legitimate, non-retaliatory reason for the failing grades set forth in the 2016 Performance Review. Plaintiff  cannot establish pretext by merely asserting that these grades were incorrectly assessed, and the Court rejects Plaintiff's argument to the contrary.

Further, Ms. Pegram-Lewis's purported failure to interview more of Plaintiff's managers and Mr. Turley's participation in the appeal of the 2016 Performance Review do not weaken or contradict Defendant's assertion that Plaintiff's largely admitted conduct during the September 1,

2016 and September 7, 2016 MDD audit team teleconferences warranted the failing grades set forth 2016 Performance Review such that a reasonable factfinder could find that Defendant's citation to Plaintiff's behavior, which was clearly violative of OIG policy, during these teleconferences was a pretext for retaliation.  Moreover, Plaintiff offers no evidence outside of pure speculation that Mr. Turley's denial of his appeal was based upon Plaintiff's protected activity.[22]  *See Dove v. Cmty. Educ. Centers Inc.*, No. CIV.A. 12-4384, 2013 WL 6238015, at *16 (E.D. Pa. Dec. 2, 2013) ("Ultimately, Plaintiff rests his belief that Gannon's behavior was motivated by either Plaintiff's condition or his request for leave on the fact that, prior to his leave, Gannon was more courteous to him.  Given the speculative nature of this testimony, no reasonable factfinder could find that Gannon's alleged involvement in the decision to terminate Plaintiff— three months after Plaintiff returned to full-duty and after Plaintiff committed an obvious security violation—was more likely than not motivated by discriminatory animus rather than by a legitimate, non-discriminatory employment determination." (citation omitted)).  As such, the Court finds that no reasonable factfinder could conclude that Plaintiff's failing grades in the 2016 Performance Review were more likely than not motivated by retaliatory animus rather than by a legitimate, non-retaliatory employment determination.  Accordingly, the Court holds that no reasonable factfinder could determine that Plaintiff has established pretext on the above-cited bases.

---

[22] Plaintiff's argument in this regard is seemingly founded on the basis that Plaintiff believes that Mr. Turley was more likely to deny Plaintiff's appeal because Mr. Turley's input was purportedly utilized in preparing the 2016 Performance Review.  Br. in Opp'n 14, ECF No. 70.  Plaintiff essentially asserts that Mr. Turley was less likely than another reviewer to overturn his own work.  Even if these assertions are true, they do not support an inference that Plaintiff's protected activities, i.e. the requesting of accommodations or contacting the EEO, as opposed to Plaintiff's largely admitted conduct during the September 1, 2016 and September 7, 2016 teleconferences, served as the basis for Mr. Turley's denial.  *See Neidigh*, 150 F. Supp. 3d at 579 ("Moreover, [a plaintiff] must do more than demonstrate that [the defendant's] basis for [ the plaintiff's] termination was incorrect or mistaken, 'since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" (quoting *Fuentes*, 32 F.3d at 765)).

The record before the Court is sufficient to establish that Plaintiff's conduct during the September 1, 2016 and September 7, 2016 MDD audit team teleconferences is a legitimate, non-retaliatory reason for the Letter of Warning and the failing grades set forth in the 2016 Performance Report.  The record would not permit a reasonable factfinder to conclude that Defendant's legitimate, non-retaliatory reason is unworthy of credence, or that retaliation was more likely than not a motivating or determinative cause of the Letter of Warning and the 2016 Performance Review.  For these reasons, Plaintiff cannot establish that Defendant's legitimate, non-retaliatory reasons for issuing the Letter of Warning and the failing grades set forth in the 2016 Performance Review were pretext for retaliation.  Accordingly, the Letter of Warning and the 2016 Performance Review cannot form the basis of a claim for retaliation under the Rehabilitation Act.

The only remaining adverse action asserted by Plaintiff in support of his retaliation claim under the Rehabilitation Act is the OIG's failure to transfer or assign Plaintiff to the Major Investments directorate when that directorate was formed in 2017.  As discussed above, the 2017 vacancy in the Major Investments directorate was not an appropriate vacant, funded position because there were no other OIG employees stationed in the Pittsburgh Office assigned to that directorate, and Plaintiff has thus not established that he was qualified to perform the essential duties of that position with reasonable accommodations.  Given the Court's holding with respect to this vacancy, the Court finds that Defendant had a legitimate non-retaliatory reason to not reassign or transfer Plaintiff to the Major Investments directorate in October 2017, namely that, based upon Plaintiff's most frequently and explicitly cited basis for requesting a transfer, specifically his inability to collaborate and work face-to-face with other directorate team members in the Pittsburgh Office, he was not qualified to perform the essential duties with reasonable accommodation of the position in the Major Investments directorate in 2017.  Further, there is no

basis in the record to conclude that Defendant's failure to assign Plaintiff to a position he was not otherwise qualified for was motivated by Plaintiff's protected activity, and the Court thus concludes that the failure to reassign him to the Major Investments directorate in 2017 cannot form the basis of a Rehabilitation Act claim for retaliation.

For all of the reasons discussed above, the Court finds that there is no genuine issue of material fact, and that summary judgment in Defendant's favor is appropriate, with respect to Plaintiff's claim for retaliation under the Rehabilitation Act.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Count II.

### C.  Plaintiff's Claim for Discrimination Under the ADEA (Count III)

The Court notes that Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment fails to oppose, in any material respect, Defendant's assertion that judgment as a matter of law is warranted as to Plaintiff's claim for discrimination under the ADEA (Count III) because Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact as to that claim.  The Court further notes that the prayer for relief in Plaintiff's Brief in Opposition ignores Count III entirely, specifically requesting that the Court "deny Defendant's Motion for Summary Judgment seeking the dismissal of Counts I, II, and IV, for disability discrimination under the Rehabilitation Act, and for Retaliation in contravention of the Rehabilitation Act and the ADEA." Br. in Opp'n 23, ECF No. 70.  This failure to address Defendant's argument respecting Count III is expressly raised in Defendant's Reply to Plaintiff's Brief in Opposition.  Reply 2, ECF No. 76. Despite seeking, *see* Mot., ECF No. 79, and being granted, *see* Order, ECF No. 80, leave to file a Surreply in this matter, Plaintiff's Surreply did not address Count III, or, for that matter, Defendant's assertion that Plaintiff had previously ignored Defendant's argument regarding Count

III, in any way.  *See generally* Surreply, ECF No. 81.  Instead, the Surreply repeated, verbatim, the request for relief quoted above, which, again, entirely ignores Count III.  *Id.* at 5.

The Court can only construe Plaintiff's seemingly intentional failure to address Defendant's assertions with respect to Count III, as well as Plaintiff's failure to even request that this Court deny summary judgment as to Count III, as a complete abandonment of Plaintiff's claim for age discrimination under the ADEA.  The Court may therefore grant summary judgment with respect to this claim without reaching the merits.  *See Jankowski v. Sage Corp.*, Civil Action No. 08-770, 2010 WL 1253544, at *9 (W.D. Pa. Feb. 23, 2010), *report and recommendation adopted*, Civil Action No. 08-770, 2010 WL 1253542 (W.D. Pa. Mar. 24, 2010) (finding, where a "[p]laintiff did not respond to [d]efendant's arguments in her Opposition to [d]efendant's Motion or otherwise discuss (let alone mention) her gender discrimination claim, much less raise any issues of fact as to why the claim should not be dismissed on summary judgment[,]" that the gender discrimination claim should be "considered abandoned" and that "the Court need not reach the merits of [that] claim." (citing cases)).  Accordingly, for the reasons discussed above, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's claim for discrimination in violation of the ADEA (Count III).[23]

### D.  Plaintiff's Claim for Retaliation Under the ADEA (Count IV)

With respect to Plaintiff's claim for retaliation under the ADEA (Count IV), Defendant again raises the argument that Plaintiff fails to address Defendant's arguments in support of summary judgment as to this claim in any way.  Reply 2, ECF No. 76.  While the Court

---

[23] The Court further notes that Plaintiff points to no evidence which supports an inference that age was a motivating factor in any action taken against him by Defendant.  *See Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 80 (3d Cir. 2019) ("A prima facie case of age discrimination under both the ADEA and the PHRA, requires the plaintiff to allege that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the adverse action occurred under circumstances that create an inference that plaintiff's age was a motivating factor." (citations omitted)).

acknowledges that Plaintiff does not directly address several of the arguments raised by Defendant with respect to Count IV, and the Court will address such issues below, the Court notes that Plaintiff clearly sets forth an opposition to summary judgment as to Count IV in opposing summary judgment as to both his ADEA and Rehabilitation Act retaliation claims collectively. *See* Br. in Opp'n 10, ECF No. 70 (heading providing: "Reasonable Minds Could Differ Over Whether Defendant Retaliated Against Plaintiff In Violation Of The Rehabilitation Act and Age Discrimination in Employment Act."); *see also id.* at 18 ("[A] reasonable factfinder could very reasonably find the excuses to be unworthy of credence, and Plaintiff has met his burden to establish pretext, and survive summary judgment regarding his *claims* for Retaliation." (emphasis added)).  Moreover, in the Brief in Opposition's prayer for relief, Plaintiff clearly asks this Court to deny Defendant's Motion for Summary Judgment as to Plaintiff's claim for ADEA retaliation at Count IV.  *Id.* at 23; *see also* Surreply 5, ECF No. 81.  Accordingly, the Court does not find that Plaintiff has abandoned this claim in same manner as discussed with respect to Count III above.

To set for a prima facie case of retaliation under the ADEA, a plaintiff is required to show that: (1) the plaintiff engaged in a protected activity; (2) the plaintiff was subject to an adverse action; (3) there was a causal connection between the protected activity and the adverse action. *Cauler v. Lehigh Valley Hosp., Inc.*, 654 F. App'x 69, 72 (3d Cir. 2016) (*Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005)).  Defendant avers that Plaintiff cannot establish that the Plaintiff engaged in protected activity under the ADEA or that there was a causal connection between protected activity and the adverse actions taken in this case, and that this Court should thus grant Defendant's Motion for Summary Judgment as to Plaintiff's claim for retaliation under the ADEA. Br. in Supp. 19, ECF No. 61.

With respect to what constitutes protected activity under the ADEA, the Third Circuit has explained:

> A person has engaged in "protected conduct" when s/he "has opposed any practice made unlawful by ... section [623]."  29 U.S.C. § 623(d).  The practice made unlawful by § 623 is "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age." 29 U.S.C. § 623(a).  Thus, the statute provides that a person has engaged in "protected conduct" when s/he opposes discrimination on the basis of age.

*Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995); *see also Anderson v. Boeing Co.*, No. CV 15-3073, 2016 WL 9446648, at *20 (E.D. Pa. Aug. 30, 2016), *aff'd*, 694 F. App'x 84 (3d Cir. 2017) ("Thus, for a retaliation claim under the ADEA, only protected activity related to age discrimination has any relevance, as no other category of conduct is encompassed by the ADEA.  Since the plaintiff in *Barber* had not referenced age discrimination, he had not engaged in protected conduct under the ADEA." (citing *Barber*, 68 F.3d at 701-02)).

As discussed above, Plaintiff asserts that the Letter of Warning, the failing grades set forth in 2016 Performance Review, and the OIG's failure to transfer him to a new directorate, specifically the Major Investments directorate when it was formed in October 2017, all constitute impermissible retaliation.  Combined Statement 43 ¶ 97, ECF No. 86.  Defendant argues that "[t]here is no evidence that Plaintiff engaged in any sort of ADEA-protected activity before the [Letter of Warning] or [the 2016] Performance Review[,]" and further argues that "none of [Plaintiff's] complaints to management before that time even touched on his age."  Br. in Supp. 20, ECF No. 61.  Plaintiff fails to respond to this argument in any material way, and the Court agrees that there is no evidence of record which suggests that Plaintiff engaged in protected activity under the ADEA prior to the issuance of the Letter of Warning or the 2016 Performance Review.

Plaintiff asserts that he engaged in protected activity "in notifying his supervisor [that Plaintiff] intended to file an EEO complaint, in filing the EEO complaint, and in seeking accommodations for his disabilities." Br. in Opp'n 10, ECF No. 70. Plaintiff's attempts to secure accommodations for his disabilities are clearly irrelevant to his ADEA retaliation claim. *See Barber*, 68 F.3d at 702. The Letter of Warning is dated September 15, 2016, *see* Appendix Ex. F, ECF No. 63, and the 2016 Performance Review was signed by Ms. Pegram-Lewis on November 9, 2016, *see* Appendix Ex. H, ECF No. 63. Plaintiff alleges that he filed his first EEO complaint of Discrimination on February 6, 2017. Compl. ¶ 13, ECF No. 35. [24] Accordingly, the filing of Plaintiff's formal EEO complaint cannot form the basis of a retaliation claim under the ADEA arising from the issuance of the Letter of Warning or the 2016 Performance Review.

In light of the above, the only possible basis for a retaliation claim arising from the issuance of the Letter of Warning and the 2016 Performance Review is Plaintiff's purported notification to "his supervisor [that Plaintiff] intended to file an EEO complaint." Br. in Opp'n 10, ECF No. 70. As noted above, Plaintiff is clearly referencing a September 7, 2016 email to Ms. Wong wherein Plaintiff stated that he would contact the Workplace Environment team within the Special Inquiries Division of the OIG regarding concerns arising from his purportedly "tense, stressful, and

---

[24] While, Plaintiff first contacted the EEO on November 8, 2016 with respect to discrimination based upon his disabilities, *see* Combined Statement 43 ¶ 96, ECF No. 86, the Court again notes that an EEO Alternative Dispute Resolution Specialist's (ADRS) Inquiry Report pertaining to Plaintiff provides:

> Counselee alleged he was discriminated against based on his mental disability (Post Traumatic Stress Disorder) and non-EEO related reprisal (threatened to contact Congress and outside agencies) when on November 8, 2016, counselee received a lower than expected end of year evaluation. He also alleged on September 15, 2016, he was issued a Letter of Warning.
>
> *NOTE: In Formal complaint, counselee added age as an additional purview.*

Appendix Ex. VV, ECF No. 63 (emphasis added). This Report does not contain a checked box next to "Age" in the section titled "Basis for Alleged Discrimination. *Id*. Accordingly, the record indicates that Plaintiff first raised age as a basis for the adverse actions taken against him on February 6, 2017, i.e. when Plaintiff filed his first EEO Complaint, at the earliest.

intimidating work environment," and further stated that he intended to pursue accommodations with the EEO.  Combined Statement 62-63 ¶ 47, ECF No. 86; *see also* Pl.'s Concise Statement Ex. 12, ECF No. 71.  The email does not reference Plaintiff's age in any manner.  Pl.'s Concise Statement Ex. 12, ECF No. 71.  Further, while the email references the EEO, it does not explicitly state that he intends to file a complaint with the EEO; but, rather indicates that he intends to pursue accommodations, presumably for his disabilities, from the EEO.  *Id.*  Finally, as discussed above, Plaintiff specifically highlighted, and noted that he highlighted, text which indicates that he believed his work  environment was a "tense, stressful, and intimidating work environment," and notably did not highlight text which could have indicated that he had experienced "discrimination." For these reasons, the Court finds that the September 7, 2016 email to Ms. Wong does not constitute protected activity under the ADEA because Plaintiff did not, by way of this email, oppose discrimination on the basis of age.  *See Barber*, 68 F.3d at 702.  Because Plaintiff did not engage in protected activity under the ADEA prior to the issuance of the Letter of Warning and the 2016 Performance Review, the Court finds that neither the Letter of Warning nor the 2016 Performance Review can form the basis of his claim for retaliation under the ADEA.

The only remaining adverse action asserted by Plaintiff in support of his retaliation claim under the ADEA is the OIG's failure to transfer or reassign Plaintiff to the Major Investments directorate when it was formed in 2017.  For the same reasons discussed above with respect to Plaintiff's claim for retaliation under the Rehabilitation Act based upon this failure to reassign or transfer, the Court concludes that the failure to reassign Plaintiff to the Major Investments directorate in 2017 cannot form the basis of an ADEA claim for retaliation.

Accordingly, for the reasons discussed above, the Court finds that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted, with respect to

Plaintiff's claim for retaliation under the ADEA.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Count IV of the Complaint.

## IV.    Conclusion

For the reasons discussed above, the Court will grant Defendant's Motion for Summary Judgment as to each of the claims set forth in the Complaint.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: October 20, 2020

cc/ecf: All counsel of record